**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROBERT M. NEWTON,                                    )
                                                     )
            Plaintiff,                               )        Civil Action No. 18-1639
                                                     )        Magistrate Judge Maureen P. Kelly
            v.                                       )
                                                     )        Re: ECF No. 164
PENNSYLVANIA STATE POLICE,                           )
                                                     )
            Defendant.                               )

<u>**MEMORANDUM OPINION**</u>

**KELLY, Magistrate Judge**

      Plaintiff Robert M. Newton ("Newton") commenced this action against the Pennsylvania State Police (the "PSP") to recover damages stemming from employment discrimination. The jury trial portion of this case was conducted on November 8 through 10, 2021, and resulted in a verdict in favor of Newton. The jury found that the PSP terminated Newton's employment in violation of the Rehabilitation Act of 1973 and awarded Newton compensatory damages in the amount of $100,000.   ECF No. 155.  On November 12, 2021, the Court conducted the non-jury portion of the trial as to back pay, front pay, reinstatement, and prejudgment interest.  ECF No. 156.

      Presently before the Court is Newton's Motion for Back Pay, Front Pay and Prejudgment Interest.   ECF No. 164.  After careful consideration of the motion, the PSP's brief in opposition, and the evidence presented, and for the following reasons, the motion will be granted and judgment will be ordered as set forth herein in favor of Newton and against the PSP for back pay, front pay, and prejudgment interest.[1]

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case.  ECF Nos. 6 and 8.

## I.       FACTUAL BACKGROUND

Newton commenced work for the PSP on September 25, 1995.  ECF No. 38 ¶ 1.[2]  In March 1996, Newton successfully completed the PSP Academy training program and was promoted to the rank of Trooper.  Id. ¶ 2. In 2001, Newton was diagnosed with an osteosarcoma in his left shoulder that metastasized to his lung.  Id. ¶ 3.  In February 2002, Newton underwent surgery to remove part of his shoulder, which resulted in him experiencing limitations with the use of his left arm.  Id. ¶ 4.  In August 2002, Newton was selected for the specialized position of Procurement and Supply Officer in the PSP Staff Services Unit.  Id. ¶ 5.  In April 2003, the PSP placed Newton on permanent limited duty status.  Id. ¶ 6.

In the fall of 2015, Newton took the written and oral tests for promotion to the rank of Corporal.  Id. ¶ 8.  The PSP bases promotions on the member's rank on the promotion list, which is determined by his/her test scores and then by seniority.  Id. ¶ 9.  Newton ranked 373 overall on the 2015-2016 PSP Corporal Promotion Examination Final Score Report.  Id. ¶ 10.

The PSP Operations Manual states that members on (permanent or temporary) limited duty status may be ineligible for promotion unless the member is able to return to full duty status within 90 calendar days.  Id. ¶¶ 21-22.  Newton never submitted medical documentation indicating he could return to full duty within 90 calendar days.  Id. ¶ 23.

The PSP also has a practice of promoting individuals "in place."  A promotion-in-place is a promotion from one rank to another while performing the same job function the member has been performing in the lower rank.  Id. ¶ 11.  The PSP does not have a policy or written procedure

---

[2] The citations in the Factual Background section of this Opinion are based on the Joint Statement of Undisputed Facts relative to Plaintiff's Motion for Partial Summary Judgment, ECF No. 38, and the Joint Statement of Undisputed Facts relative to the instant motion, ECF No. 163.

regarding promotions in place, but the Commissioner's office reviews the promotion eligibility list and determines if anyone is eligible for promotion-in-place.  Id. ¶¶ 12-14.

The PSP asserts that it did not promote Newton from the rank of Trooper to Corporal because he did not submit medical documentation indicating that he could return to full duty.  Id. ¶ 24.

On September 4, 2020, Newton was forced to retire by the PSP from his Procurement and Supply Officer position.   ECF No. 163 ¶ 4.

## II.    PROCEDURAL HISTORY

Newton commenced this action against the PSP on December 7, 2018, with the filing of the initial Complaint.  ECF No. 1.  He sought damages in the form of back pay, front pay, and compensation for emotional distress, as available under the Rehabilitation Act of 1973, 29 U.S.C. § 794a(a)(2) and 28 U.S.C §§1343(a)(3) and (a)(4) and 1331, and the Americans with Disabilities Act ("ADA"), 42 U.S.C.  §§ 12101, et seq.  In Count I of the initial Complaint, Newton alleged violations of the Rehabilitation Act based on the PSP's refusal to promote him to the position of Corporal because of his disability, record of disability, and/or perceived disability. Id. ¶¶ 28-34. In Count II, Newton alleged that he was subjected to harassment, discrimination, and retaliation by the PSP based on his disability in violation of the PHRA.  Id. ¶¶ 35-37.

The PSP filed Defendant's Answer to Plaintiff's Complaint on February 25, 2019.  ECF No. 12. Thereafter, the parties conducted discovery.  Discovery closed on January 31, 2020.  ECF No. 26.

On March 16, 2020, Newton filed a Motion for Partial Summary Judgment and Brief in Support.  ECF Nos. 39 and 40.  Newton sought judgment as a matter of law as to Count I, discrimination in violation of the Rehabilitation Act, and as to part of Count II, discrimination in

violation of the PHRA.  ECF No. 39 ¶ 5. The PSP filed a Response to Plaintiff's Partial Motion for Summary Judgment on April 20, 2020.  ECF No. 48.  Newton filed a Reply Brief.  ECF No. 49.  On May 26, 2020, this Court issued an Opinion and Order denying Plaintiff's Motion for Partial Summary Judgment and dismissing Plaintiff's PHRA claims in federal court on the basis of Eleventh Amendment immunity.  ECF No. 53.

The PSP forced Newton to retire on September 4, 2020. As a result, Newton sought to amend his Complaint to assert additional claims. ECF No. 61. The PSP consented to the proposed amendment, and the Amended Complaint was filed on September 16, 2020.  ECF Nos. 61 and 68. Newton asserted claims for violation of the Rehabilitation Act, including Failure to Promote (Count I), Termination (Count II), and Retaliation (Count III).  Id.  Thereafter, following the issuance of a right to sue notice from the Equal Opportunity Employment Commission (the "EEOC"), Newton filed a Second Amended Complaint on January 8, 2021.  ECF No 81.  Newton added additional claims under the ADA for Discrimination (Count IV) and Retaliation (Count V). Id.

On April 8, 2021, the parties stipulated to the dismissal of the ADA and Rehabilitation Act retaliation claims (Counts III and V).   ECF No. 93.   Prior to trial, the parties stipulated to the dismissal of the ADA discrimination claim (Count IV).  ECF No. 142.   As a result, the case proceeded to trial on Newton's failure to promote and termination claims.

As noted above, the jury trial portion of this case was conducted on November 8 through 10, 2021.  On November 10, the jury returned a verdict in favor of Newton, finding that the PSP terminated his employment in violation of the Rehabilitation Act of 1973, and awarding compensatory damages in the amount of $100,000.[3]   ECF No. 155.  On November 12, 2021, the

---

[3] The jury found in favor of the PSP on the failure to promote claim.  ECF No. 155.

Court conducted the non-jury portion of the trial as to back pay, front pay, reinstatement, and prejudgment interest relative to the termination claim.  ECF No. 156.

On December 22, 2021, Newton filed a Motion for Back Pay, Front Pay and Prejudgment Interest and brief in support.  ECF Nos. 164 and 165.  The PSP filed a Response to Plaintiff's Motion for Damages.  ECF No. 168.  Newton filed a Reply.  ECF No. 172.[4]

The Motion for Back Pay, Front Pay and Prejudgment Interest is now ripe for consideration.

## III.   FINDINGS OF FACT

### A.  Back Pay and Front Pay

1.   The PSP paid Newton pursuant to a Collective Bargaining Agreement.  (ECF No. 162 at 10).

2.   The Collective Bargaining Agreement includes pay scales for various Pennsylvania State Police ranks, including Trooper.  ECF No. 162  at 10.

3.   The pay scales from July 1, 2017, through June 30, 2024, are set forth on Joint Exhibit 9.  ECF No. 162 at 11.

4.   Newton was forced to retire on September 4, 2020.  ECF No. 162  at 11.

5.   At the time of his forced retirement, Newton was on longevity range "U" of the pay scale.  ECF No. 162  at 12.

6.   Newton was on the "SP01, Trooper, Step E" column of the pay scale at the time of his retirement.  ECF No. 162  at 12.

---

[4] The parties also filed a Joint Statement of Undisputed Facts, ECF No. 163, and separately filed proposed findings of fact and conclusions of law, ECF Nos. 166 and 169.

7. At the time of his forced retirement in September 2020, Newton was earning a bi-weekly rate of $4,170.40. ECF No. 162 at 13.

8. Newton advanced on the longevity range of the pay scale in mid-September based on his anniversary date for his start of employment. ECF No. 162 at 13).

9. Had Newton not been forced to retire, he would have moved up to longevity range "V" in mid-September 2020. ECF No. 162 at 13.

10. From mid-September 2020 through June 30, 2021, Newton would have earned a bi-weekly rate of $4,203.20. ECF No. 162 at 13-14.

11. From July 1, 2021, through mid-September 2021, Newton would have earned a bi-weekly rate of $4,288.00. ECF No. 162 at 14.

12. Had Newton not been forced to retire, he would have moved up to longevity range "W" in mid-September 2021. ECF No. 162 at 14-15.

13. From mid-September 2021 through June 30, 2022,[5] Newton would have earned a bi-weekly rate of $4,322.40. ECF No. 162 at 15.

14. From July 1, 2022, through mid-September 2022, Newton would have earned a bi-weekly rate of $4,397.60. ECF No. 162 at 15-16.

15. Had Newton not been forced to retire, he would have moved up to longevity range "X" in mid-September 2022. ECF No. 162 at 16.

16. From mid-September 2022 through September 30, 2023, Newton would have earned a bi-weekly rate of $4,432.00. ECF No. 162 at 16.

---

[5] The Joint Statement of Undisputed Facts refers to expected income and benefits earned in future time periods. Newton assumes that had he not been forced to retire in September of 2020, he would have continued his employment until his mandatory retirement at age of 60. PSP does not dispute that this is Newton's assumption for the purposes of calculating anticipated future salary and benefits had he remained employed by the PSP after September 2020. However, it is the PSP's position that by virtue of the speculative nature of future events, these facts are not undisputed in the same sense that past events may be undisputed. Therefore, the parties stipulate only to the data upon which they base their respective calculations and arguments.

17. Newton would have capped out on Step X of the longevity range on the pay scale as of mid-September 2022, but would have continued to receive pay increases with each new contract year.  ECF No. 162  at 16-17.

18. Historically, the PSP has had pay increase effective July 1 of each year.  ECF No. 162 at 17.

19. The final pay scale of the current Collective Bargaining Agreement is effective from October 1, 2023, through June 30, 2024.  ECF No. 162  at 17.

20. From October 1, 2023, through June 30, 2024, Newton would have earned a bi-weekly rate of $4,509.60.  ECF No. 162  at 17-18.

21. While employed by the PSP, Newton typically worked about 5 hours of overtime each month.  ECF No. 162  at 18.

22. Newton's back pay calculations do not account for any overtime.  ECF No. 162  at 18.

23. Had Newton not been forced to retire, he would have earned $37,796.00 from September 4, 2020, through December 31, 2020.  ECF No. 162  at 20.

24. Newton did not have any earnings from comparable employment from September 4, 2020, through December 31, 2020.  ECF No. 162  at 20.

25. Had Newton not been forced to retire, he would have earned $94,480 from January 1, 2021, through November 12, 2021.  ECF No. 162  at 22.

26. Newton did not have any earnings from comparable employment in 2021.  ECF No. 162  at 22.

27. Newton expected to retire from the PSP at age 60, which is the mandatory age for PSP retirement.  ECF No. 162  at 23.

28. Newton's date of birth is August 27, 1973, and he is currently 48 years old.  ECF No. 162  at 23.

29. Newton will turn 60 on August 27, 2033.  ECF No. 162  at 23.

30. Newton's front pay calculations do not account for any overtime.  ECF No. 162  at 24.

31. Had Newton not been forced to retire, he would have earned $71,320.00 from November 13, 2021, through June 30, 2022.  ECF No. 162  at 24-25.

32. Had Newton not been forced to retire, he would have earned $115,060 from July 1, 2022, through June 30, 2023.  ECF No. 162  at 25-26.

33. Had Newton not been forced to retire, he would have earned $116,745 from July 1, 2023, through June 30, 2024.  ECF No. 162  at 26-28.

34. Historically, the annual salary increases on PSP's pay scales were up to 4 percent.  ECF No. 162  at 29.

35. There has always been an annual pay increase in the union contract.  ECF No. 162  at 30.

36. The last pay increase in the current union contract is 1.75 percent.  ECF No. 162  at 29.

37. To calculate his front pay damages beyond the current union contract, Newton estimated annual pay increases of 1.75 percent.  ECF No. 162  at 29.

38. Had Newton not been forced to retire, he estimates he would have earned $118,778 for the period of July 1, 2024, to June 30, 2025.  ECF No. 162  at 30.

39. Had Newton not been forced to retire, he estimates he would have earned $120,857 for the period of July 1, 2025, to June 30, 2026.  ECF No. 162  at 30.

40. Had Newton not been forced to retire, he estimates he would have earned $122,972 for the period of July 1, 2026, to June 30, 2027.  ECF No. 162  at 31.

41. Had Newton not been forced to retire, he estimates he would have earned $125,124 for the period of July 1, 2027, to June 30, 2028.  ECF No. 162  at 31.

42. Had Newton not been forced to retire, he estimates he would have earned $127,313 for the period of July 1, 2028, to June 30, 2029.[6]  ECF No. 162  at 31.

43. Had Newton not been forced to retire, he estimates he would have earned $129,541 for the period of July 1, 2029, to June 30, 2030.  ECF No. 162  at 31.

44. Had Newton not been forced to retire, he estimates he would have earned $131,808 for the period of July 1, 2030, to June 30, 2031.  ECF No. 162  at 31.

45. Had Newton not been forced to retire, he estimates he would have earned $134,115 for the period of July 1, 2031, to June 30, 2032.  ECF No. 162  at 31.

46. Had Newton not been forced to retire, he estimates he would have earned $136,462 for the period of July 1, 2032, to June 30, 2033.

47. Newton is part of the State Employees' Retirement System ("SERS").  ECF No. 162 at 32.

48. When Newton was forced to retire, he elected an option to roll his pension contributions into an Individual Retirement Account.  ECF No. 162  at 32.

49. Newton receives a monthly pension benefit of $5,516.13.  ECF No. 162  at 33.

50. Newton's monthly pension benefit was calculated by taking 62% of the salary he earned in his final full calendar year of employment.  ECF No. 162  at 33.

---

[6] Upon review of the front pay chart set forth on page 2 of Plaintiff's Exhibit 3, the parties stipulate that Newton's front pay calculation inadvertently skipped the year July 1, 2028, through June 30, 2029. ECF No. 163 at 5 n.3.

51. Had Newton continued to work until age 60, his final full calendar year of employment pay would have been $135,288.[7]

52. Had  Newton worked through age 60 and elected the same pension option, he estimates that his annual SERS benefit would have been $83,878.[8]

53. According to the Social Security Administration Life Expectancy Calculator, Newton's life expectancy is age 81.6.[9]  ECF No. 162  at 35.

**B.  Reinstatement**

**1.  Damaged relationship/animosity between the parties.**

54.     Newton did not consider leaving the PSP after his 2001 cancer diagnosis because being a state trooper "meant everything" to him.   ECF No. 159 at 52.

55.     The sole witness for the PSP testified unequivocally that PSP did not promote Newton from the position of Trooper to the position of Corporal – and then forced him to retire – because he was not able to return to full duty due to his disability.  ECF No. 159 at 193.

56.     In March 2017, the PSP promoted 14 members "in place" from Trooper to Corporal.  The PSP did not promote Newton "in place" from Trooper to Corporal.  ECF No. 159 at 109.

57.     Between March 2017 and July 2017, the PSP promoted six Troopers to the position of Corporal who were below Newton on the eligibility list.  ECF No. 159 at 110.

58.     As to the "in place" promotions and the promotion of troopers below Newton on the eligibility list, Newton was the only trooper who was disabled.  ECF No. 159 at 110.

---

[7] The parties have agreed that in light of the omission of one year of front pay as noted *infra* at footnote 6, the calculation for Newton's final annual salary has been adjusted accordingly.

[8] In consideration of the omission of one year of front pay and the adjusted calculation for Newton's final salary, see *infra* n. 6, the calculation for his retirement benefit likewise has been adjusted.

[9] See https://www.ssa.gov/oact/population/longevity.html

59.     On August 13, 2020, Newton was advised by his supervisor that he had to retire effective immediately.  ECF No. 159 at 77.

60.     Newton requested to stay on, but the next day his supervisor informed him that the PSP rejected his request.  ECF No. 159 at 78-79.

61.     The PSP requires anyone who is disabled to retire when they reach 25 years of service despite permissive language in the Collective Bargaining Agreement that allows disabled employees to be retained.  ECF No. 159 at 113 and 196.

62.     The PSP has allowed non-disabled employees to remain in the position of Procurement and Supply Officer after 25 years of service, including the Trooper holding the position in Erie.  ECF No. 159 at 114-115.

63.     Newton's letter of resignation was a form letter provided by the PSP that anyone who is retiring must submit.  ECF No. 19 at 195-196.

64.     The refusal by the PSP to promote Newton and the decision of the PSP to force Newton to retire caused him to feel betrayed, let down, and saddened.  He was deeply hurt and disappointed.  ECF No. 159 at 84.

65.     Newton testified that he was very humiliated and extremely embarrassed by the actions of the PSP.  He described feeling demeaned, disregarded, and devalued.  ECF No. 159 at 84.

66.      Newton testified that the actions of the PSP drained his dignity and his feeling of self-worth bottomed tremendously.  ECF No. 159 at 85.

67.     Newton feels that everything that he did for the PSP for 25 years did not matter. ECF No. 159 at 85.

### 2.    Availability of position

68.    Throughout the course of this litigation, the PSP took the position that reinstatement was not available because his position as a Procurement and Supply Officer was civilianized.

69.    According to the PSP, the Procurement and Supply Officer position was civilianized effective December 24, 2008, as set forth in the July 1, 2017 – June 30, 2020 Collective Bargaining Agreement.  ECF No. 148 at 1; ECF No. 148-1.

70.    "Civilianized" means that instead of Troopers performing the job function, civilians are hired for the job.  ECF No. 148 at 1.

71.    Pursuant to the terms of the Collective Bargaining Agreement, civilianization of a position does not occur until the incumbent retires or is voluntarily reassigned. ECF No. 146-1 at 2; ECF No. 148-1.

72.    The PSP took the position on the record that the law does not require it to keep Newton "employed as a procurement and supply employee" "merely because it previously accommodated him."  ECF No. 148 at 3-4.

73.    During the nonjury portion of trial, counsel for the PSP acknowledged that Newton's former position has "since been civilianized" and is not available for Newton.  ECF No. 162 at 56-57.

74.    During the nonjury portion of trial, Newton did not seek reinstatement because the PSP had taken the position that the Procurement and Supply Officer position no longer existed for Newton because it was civilianized.  ECF No. 162 at 55.

### C. Mitigation

75.     Newton worked for the PSP from September 25, 1995, until September 4, 2020, when he was forced to retire.  From August 2002 until September 4, 2020, Newton held the position of Procurement and Supply Officer (with the rank of Trooper).  ECF No. 38 ¶¶ 1-6.

76.     Newton is familiar with software programs that are used in the procurement and supply field.  ECF No. 162  at 47- 48.

77.      Newton coordinated the equipment and supplies for PSP Troopers working for the G20 Summit in Pittsburgh in 2009.  ECF No. 162  at 64.

78.     Newton attended Slippery Rock University and majored in Business Management and Marketing from 1991 through 1994.  ECF No. 162  at 45.

79.     Newton did not earn a college degree because he left Slippery Rock University one semester before graduating to prepare for admission to the PSP Academy.  ECF No. 162  at 46.

80.     Newton has been looking for a job since he was forced to retire from his employment with the PSP, in September 2020.  ECF No. 162  at 8.

81.     Newton uses online resources, including Indeed and ZipRecruiter, to search for job openings.  ECF No. 162  at 8.

82.     Newton also created an account with Westinghouse Industries and submitted his resume to the company so he could be notified of any positions for which he may qualify.  ECF No. 162  at 8.

83.     Newton also searches in local newspapers, including the Butler Eagle and Cranberry Eagle, for job openings.  ECF No. 162  at 8.

84.     Since he was forced to retire in September 2020, Newton has consistently looked for a job three to five times per week, for about an hour at a time, looking online and in local newspapers for potential employment opportunities.  ECF No. 162 at 9.

85.     The Court takes judicial notice that Newton was forced to retire during the COVID pandemic.

86.     Newton was not aware of any networking events or panel discussions in his field for the period September 20, 2020, through the date of trial.  ECF No. 162 at 44, 58-59.

87.      Newton rarely sees available jobs that match his skill set and abilities.  ECF No. 162 at 9.

88.      Between September 2020 and November 2021, Newton applied to six positions. ECF No. 162 at 9.

89.     Newton's most recent application was submitted the week before trial.  ECF No. 162 at 8.

90.      Newton has been searching for a job comparable to his position with the PSP, including as a buyer, senior buyer, procurement, or supply planner.  ECF No. 162 at 9.

91.      Newton has applied for every job opening he has seen that matches his skill set. ECF No. 162 at 10.

92.     Newton has not received any job offers since September 2020. ECF No. 162 at 9.

## IV.     CONCLUSIONS OF LAW

### A.  Back Pay

93.     "Title VII precedent instructs us that the normative principle of relief in an employment discrimination situation is the award of backpay. The award of such relief is made

not solely to deter would be discriminators … but also to provide meaningful relief to the victims of illegal discrimination." Gurmankin v. Constanzo, 626 F. 2d 1115, 1120-21 (3d Cir. 1980).

94.     In Abermarle Paper Co. v. Moody, 422 U.S. 405 (1975), the United States Supreme Court established the presumptive right to a back pay order as a remedy for unlawful discrimination noting that the district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future. Id. at 418-419. There is a presumption in favor of back pay, the intent of which is to make "persons whole for injuries suffered through past discrimination." Booker v. Taylor Milk Co., 64 F.3d 860, 864 (3d Cir. 1995), quoting Albermarle, 422 U.S. at 421.

95.     Back pay is not reduced by either unemployment benefits collected by the plaintiff or by taxes that would been paid on the income.  Dillon v. Coles, 746 F. 2d 998, 1006 (3d Cir. 1984); Craig v. Y&Y Snacks, Inc., 721 F. 2d 77 (3d Cir. 1983).[10]

96.     Back pay awarded to a plaintiff is the difference between the wages that the plaintiff would have earned absent discrimination and the wages that he or she actually earned.  Durham Life Ins. Co. v. Evans, 166 F. 3d 139, 156 (3d Cir. 1999).

97.     An award of back pay is calculated from the date of the unlawful termination to  the date that judgment is entered in the plaintiff's favor.  Gallo v. John Powell Chevrolet, Inc., 779 F. Supp. 804, 813 (M.D. Pa. 1991).

98.     Newton claims a total back pay loss from September 4, 2020, through November 11, 2021, of  $132,276. ECF No. 165 at 2-5.  PSP agrees that back in the amount of $132,276 is appropriate. ECF No. 168 at 2.

---

[10] This Court previously held that in furtherance of anti-discrimination laws, the receipt of collateral benefits such as Social Security, unemployment compensation, and pension benefits do not offset the recovery of damages.  See Memorandum Order, No. 18-1639, 2021 WL 4596448, at *2 (W.D. Pa. Oct. 6, 2021) (ECF No. 134), (citing Maxfield v. Sinclair Int'l, 766 F.2d 788, 794 (3d Cir. 1985)).

99.     The Court finds that Newton is entitled to an award of back pay in the amount of $132, 276.

**B.  Prejudgment Interest**

100.    Newton is entitled to prejudgment interest on the back pay award to reimburse him for the use of his funds from the date of his retirement through the date of judgment.   Booker v. Taylor Milk Co., Inc., 64 F.3d at 868; Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1102-03 (3d Cir. 1995); Green v. USX Corp., 843 F.2d 1511, 1530 (3d Cir. 1988), *vacated*, 490 U.S. 1103 (1989), *on remand,* 896 F.2d 801 (3d Cir. 1990); Berndt v. Kaiser Aluminum & Chem. Sales, Inc., 789 F.2d 253, 259 (3d Cir. 1986); Arco Pipeline Co. v. SS Trade Star, 693 F.2d 280, 281 (3d Cir. 1982).

101.    The district court has discretion to award prejudgment interest on back pay damages. Diaz v. Saucon Valley Manor, Inc., No. 12-433, 2013 WL 4564300, at *2 (E.D. Pa. Aug. 27, 2013) (citing Marra v. Philadelphia Housing Auth., 404 F. Supp. 2d 839, 848 (E.D. Pa. 2005); Hermann v. City of Allentown, 985 F. Supp. 569, 581 (E.D. Pa. 1997)).

102.    There is a strong presumption in favor of awarding prejudgment interest, except where the award would result in unusual inequities.  Id., citing Brock v. Richardson, 812 F.2d 121, 127 (3d Cir. 1987).  Indeed, it is an abuse of discretion to deny prejudgment interest unless the plaintiff unreasonably delayed the case.  Id

103.    Here, the Court finds that there is no evidence of any unusual inequities or that this case was delayed by Newton.

104.    The parties agree that prejudgment interest on Newton's back pay should be calculated at the IRS adjusted prime rate for underpayment, as set forth in 26 U.S.C. § 6621(a)(2). ECF No. 165 at 6; ECF No. 168 at 2.

105.    This rate has been recognized by the United States Court of Appeals for the Third

Circuit as appropriate for the calculation of prejudgment interest. Taxman v. Board of Education

of Township of Piscataway, 91 F.3d 1547, 1566 (3d Cir. 1996)(en banc); EEOC v. Erie County,

751 F.2d 79, 82 (3d Cir. 1984).

106.    The Court finds that Newton is entitled to an award of prejudgment interest based

on the IRS adjusted prime rate for underpayment of 3%, as provided for in 26 U.S.C. § 6621(a)(2).

The calculation is as follows:

| Dates | Accrued back pay & interest | 3% interest | Total |
|---|---|---|---|
| 9/4/20 - 12/31/20 | $ 37,796.00 | $1,133.88 | $ 38,929.88 |
| 1/1/21 – 11/12/21 | $ 38,929.88 | | |
| | + 94,480.00 | | |
| | $133,409.88 | +$4,002.30 | |
| | | $5,136.18 | |

107.    Accordingly, Newton is awarded prejudgment interest in the amount of $5,136.18

for the period of September 4, 2020, through November 12, 2021.

**C.  Reinstatement**

108.    Reinstatement and the alternative remedy of front pay are a part of the "make

whole" relief available to a prevailing plaintiff in an employment discrimination case. Donlin v.

Philips Lighting N. Am. Corp., 581 F. 3d 73, 86 (3d Cir. 2009).

109.    Reinstatement "advances the policy goals of make-whole relief and deterrence in a

way which money damages cannot." Squires v. Bonser, 54 F. 3d 168, 172-173 (3d Cir. 1995).

110.    Courts acknowledge that in certain circumstances, reinstatement may not be feasible, such as where there is no position available or the "relationship between the parties [is] so damaged by animosity that reinstatement is impracticable." Maxfield, 766 F. 2d at 796. In these situations, courts typically allow for front pay damages instead. Id.

111.    Front pay is an alternative to the remedy of reinstatement where there is a likelihood of "continuing disharmony" between the parties. Donlin, 581 F. 3d at 86 (citing Blum v. Witco Corp., 829 F. 2d 367, 374 (3d Cir. 1987) and Goss v. Exxon Office Sys Co., 747 F.2d 885, 890 (3d Cir. 1984)).

112.    As to availability of Newton's former position, the PSP has consistently taken the position throughout the litigation of this case and at trial that Newton's former position of Procurement and Supply Officer no longer exists because it was civilianized and, therefore, is not available for Newton to return to. ECF No. 162 at 55-56.

113.    Pursuant to the terms of the Collective Bargaining Agreement and PSP practice, civilianization of identified PSP positions occurs only through attrition such that a Trooper may be replaced by a civilian only when he or she retires or leaves the position voluntarily. ECF No. 146-1 at 2; ECF No. 148-1 at 5.

114.    In light of the civilianization of the Procurement and Supply Officer position, the PSP took the position in pretrial filings and at trial that "Mr. Newton was not qualified for the position [of Trooper] and could not perform the essential duties of a Trooper." ECF No. 148 at 2-3. According to the PSP, the essential duties of a non-specialized Trooper role include using a firearm, pursuing suspects, performing rescues and other physical tasks. As such, Newton could not perform the essential functions of a Trooper job because of the cancer surgery on his left shoulder. Id.; ECF No. 159 at 159.

115.    Thus, the Court finds that due to the civilianization of Newton's job after he was forced to retire, there is no position available for Newton to return to with the PSP.

116.    The PSP also clearly stated that the law does not require the PSP to keep Newton "merely because it previously accommodated him."  ECF No. 148 at 3-4.

117.    Based on the record and evidence presented, the Court finds that the relationship between the PSP and Newton is so damaged that reinstatement is impractical, including but not limited to: (1) the refusal of the PSP to promote Newton solely because of his disability; (2) PSP's decision to terminate Newton because of his disability; and, (3) the sudden and absolute manner in which it notified Newton of his termination. Further, the Court takes particular note of the raw and genuine emotional damage that this pattern of treatment by the PSP inflicted on Newton as observed during his trial testimony.

118.    In light of the unequivocal position adopted by the PSP that Newton was not and is not qualified to remain employed, reinstatement of Newton to his former position, even if available, would only serve to further exacerbate the disharmony between the parties.[11]

119.    The Court also takes judicial notice of Newton's Pennsylvania Human Relation Act claim pending against the PSP in the Court of Common Pleas of Allegheny County.

120.    While the PSP pointed out that Butler PSP barracks had a cake for Newton and a few people had lunch with him on his last day, this evidence does not obviate the disharmony between the PSP and Newton.

121.    Given the ongoing nature of the pattern of treatment of Newton by the PSP, and based on the additional findings set forth herein, the Court finds that there is substantial likelihood

---

[11] Newton correctly points out in his Reply that despite the PSP's ongoing and adamant resistance to the possibility of reinstatement, its plea of the sudden availability of his civilianized position is not sufficiently explained, given that the position is currently filled.  ECF No. 172 at 1.

of significant "continuing disharmony" if reinstatement was ordered. As such, reinstatement is clearly not feasible or practicable in the context of the facts of this particular case.

### D.  Front Pay

#### 1.  Time period and front pay calculation

122.     Where reinstatement is not appropriate, as is the case here, front pay is a proper remedy. Feldman v. Philadelphia Housing Auth., 43 F.3d 823 (3d Cir. 1994).

123.     Front pay compensates a plaintiff for damages he or she can reasonably expect to suffer going forward from the date of the judgment as a result of unlawful termination. Blum, 829 F. 2d at 374.

124.     In awarding front pay, a court considers the nature of the plaintiff's work, whether he or she will be able to find comparable work, his or her life expectancy, and whether he or she would have continued to work to a specific age.  Although the calculation of such an award requires some speculation about future events, the plaintiff need only prove damages without "unreasonable speculation," as the employer bears the risk associated with speculation.   Id. at 376; Bartek v. Urban Redevelopment Auth. of Pittsburgh, 882 F. 2d 739, 746 (3d Cir. 1989).

125.     "The risk of lack of certainty with respect to projections of lost income must be borne by the wrongdoer, not the victim." Goss v. Exxon Office Systems Co., 747 F.2d at 889.

126.     Front pay is an award "for a reasonable future period required for the victim to reestablish [his] rightful place in the job market." Id. at 889-890.

127.     "[C]ourts may award front pay where a victim of employment discrimination will experience a loss of future earnings because [he] cannot be placed in the position [he] was unlawfully denied." Donlin, 581 F.3d at 86.

128.     Because the term of years a court may award a prevailing plaintiff to compensate

him for his projected future lost earnings turns on the facts of each unique case, such decisions are

left to the sound discretion of the district court and every case must be considered on its particular

facts.  Id. at 88.

129.     The United States Court of Appeals for the Third Circuit and other courts of appeals

have affirmed front-pay awards of 10 years or more. See, e.g., Donlin, 581 F.3d at 88 (affirming a

district  court's award of front pay for 10 years to a victim of gender discrimination); Bianchi v.

City of Phila., 80 F. App'x 232, 237 (3d Cir. 2003) ("The jury ... could infer that at age 52,

[plaintiff] had approximately thirteen more years of work left until his retirement. The award was

not unreasonable."); Meacham v. Knolls Atomic Power Lab., 381 F.3d 56, 79 (2d Cir.

2004)(affirming a district court's award of front pay for 9-12.5 years to victims of age

discrimination), vacated on other grounds sub nom KAPL, Inc. v. Meacham, 544 U.S. 957 (2005);

Pierce v. Atchison, Topeka & Santa Fe Ry. Co., 65 F.3d 562, 574 (7th Cir. 1995)(10-year front

pay award did not constitute an abuse of discretion); Hukkanen v. Int'l Union of Operating Eng'rs,

Hoisting & Portable Local No. 101, 3 F.3d 281, 286 (8th Cir. 1993)(same); Belk v. City of Eldon,

228 F.3d 872, 883 (8th Cir. 2000) (abrogation on other grounds recognized in Palmer v. Cty. of

Anoka, 200 F. Supp. 3d 842, 847 (D. Minn. 2016)) (finding front pay award of ten years would

allow plaintiff adequate time to find commensurate employment or taken her to "normal retirement

age");  Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 511–12 (9th Cir.

2000)(holding front pay award utilizing a twenty-two-year "expected remaining work life" was

appropriate where plaintiff would have reached age of sixty-five); Gotthardt v. Nat'l R.R.

Passenger Corp., 191 F.3d 1148, 1156 (9th Cir. 1999)(upholding front pay calculation that

assumed plaintiff would work until the mandatory retirement age of seventy); Padilla v. Metro-

North Commuter R.R., 92 F.3d 117, 125 (2d Cir. 1996), *cert. denied*, 520 U.S. 1274 (1992))(finding a twenty-year front pay award appropriate where it would have taken employee to the age of sixty-seven and eligible for his pension); Bates v. Bd. of Educ. Capital Sch. Dist., No. 97-394, 2000 WL 376405, at *10 (D. Del. Mar. 31, 2000) (modifying front pay award from twenty years to seventeen years because plaintiff testified she would want to work until she was sixty-five).

130.     In cases where the plaintiff is specialized in a particular field and there are limited opportunities for employment outside the defendant employer, an award of front pay extending to the plaintiff's expected retirement date can be appropriate. See e.g., Padilla, 92 F.3d at 125-126 (front pay award for "well over [twenty] years" until age sixty-seven reasonable under Federal antidiscrimination statute where plaintiff did not attempt to obtain comparable employment, but rather worked at lower-paying position, because of unique and specialized nature of his work, employer's failure to show that plaintiff could obtain comparable work, and purpose of front pay damage awards, which is to ensure that victims of discrimination are made whole); Kelley v. Airborne Freight Corp., 140 F.3d 335, 355-356 (1st Cir. 1998), *cert. denied*, 525 U.S. 932 (1998)($1 million in front pay damages under Massachusetts law for forty-six year old plaintiff until his retirement age of sixty-five, where testimony was that because of plaintiff's lack of education he would not be able to obtain job at comparable salary); Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1189 (2d Cir. 1992), *cert. denied*, 506 U.S. 826 (1992) (front pay award for seventeen years).

131.     In this case, Newton was employed by the PSP for 25 years and held the rank of Trooper from March 1996 through September 4, 2020, when he was forced to retire.

132.    Newton's training and experience with the PSP from 1996 through 2001 was as a Patrol Trooper, except for one year in an aviation patrol unit.  ECF No. 159 at 49-50.

133.    From August 2003 until his forced retirement on September 4, 2020, Newton held the position of Procurement and Supply Officer.  Id. at 56-57.  In that position, he was responsible for acquiring, procuring, distributing, and reallocating uniforms, weapons, and safety equipment.  He functioned as the field purchasing officer, contracts administrator, and oversaw certain bidding.  He also served as central inventory officer.  As supply officer, he worked with SAP and SRM software.  He also was involved in budgeting for the troop.  Id. at 57 – 66.

134.    The Court finds that Newton has specialized knowledge and experience in the field of procurement and supply for the PSP.  Of note, this knowledge and experience is limited to a state law enforcement agency. As such, there will be limited opportunities for employment for Newton outside of a law enforcement agency that is large enough to have a such a position.

135.    Newton has no prior work experience in the private sector.  This lack of private sector experience is likely to be an impediment to Newton obtaining comparable employment in the private sector.

136.    The evidence reflects Newton's difficulty in finding comparable employment since his termination by the PSP.

137.    To date, Newton has applied for the limited number of available comparable job postings that his job search has located; however, he has not been interviewed nor hired for any of these comparable positions.

138.    Newton does not have a college degree.

139.    Newton left Slippery Rock University in 1994 to enter the PSP Academy before he completed his bachelor's degree.

140.     Even if Newton were to re-enroll at Slippery Rock University or some other college, it is uncertain after 28 years away, what credits would be accepted and the number of additional credits that would be required to complete a degree.

141.     Within the confines of these limited employment opportunities, it is reasonable to expect that Newton may need to make the disclosure to any potential employer of his need for reasonable accommodation of his physical limitations, and that this disclosure may impact his ability to obtain comparable employment.

142.     In light of Newton's undisputed permanent physical limitations in the use of his left arm, there is no realistic opportunity for him to return to any active law enforcement job.

143.     Considering the unique facts and circumstances of this particular case including, but not limited to the matters identified herein, the Court exercises its discretion and finds that an award of front pay for a period of 11.8 years (date of termination to PSP mandatory retirement at 60) is reasonable and warranted.[12]

144.     The Court finds that the PSP's argument that an award of front pay limited to three years is not supported by the record and the unique facts of this particular case.

145.     The calculation of front pay is as follows:

| Dates | Amount of Lost Front Pay[13] |
|---|---|
| 11/13/21 – 6/30/22 | $ 71,320 |
| 7/1/22 – 6/30/23 | 115,060 |
| 7/1/23 – 6/30/24 | 116,745 |

---

[12] The Court notes, as pointed out by Newton in his Reply, that the PSP never objected to the introduction of evidence of front pay damages at trial.  Therefore, Newton argues that any objection to the award of front pay is waived.  In the interest of completeness, the Court conducted an analysis of the merits of Newton's request for front pay.

[13] Although Newton typically worked 5 hours per month of overtime, he does not include overtime in his front pay request.  ECF No. 163 ¶ 30.

| | |
|---|---|
| 7/1/24 – 6/30/25 | 118,778 |
| 7/1/25 – 6/30/26 | 120,857 |
| 7/1/26 – 6/30/27 | 122,972 |
| 7/1/27 – 6/30/28 | 125,124 |
| 7/1/28 – 6/30/29 | 127,313 |
| 7/1/29 – 6/30/30 | 129,541 |
| 7/1/30 – 6/30/31 | 131,808 |
| 7/1/31 – 6/30/32 | 134,115 |
| 7/1/32 – 6/30/33 | 136,462 |
| 7/1/33 – 9/1/33 | 22,744 |
| ***TOTAL*** | **$1,472,839** |

### 2. Mitigation

146.     While an employment discrimination plaintiff has a duty to mitigate his damages by seeking comparable employment elsewhere, failure to mitigate is an affirmative defense and the burden of proving every element of the defense rests on the employer.  Booker, 64 F. 3d at 864; Roach v. Am. Radio Systems Corp., 80 F. Supp. 2d 530, 534 (W.D. Pa. 1999).

147.     To meet this burden, the employer must establish that the plaintiff was not reasonably diligent in obtaining substantially equivalent employment or that the plaintiff withdrew entirely from the employment market. See Caufield v. Ctr. Area Sch. Dist., 133 F. App'x 4, 10–11 (3d Cir. 2005). "Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the … claimant has been discriminatorily

terminated." <u>Holocheck v. Luzerne Cty. Head Start, Inc.</u>, No. 04-2082, 2007 WL 954308, at *13 (M.D. Pa. Mar. 28, 2007) (internal quotation marks and citation omitted).

148.    The PSP failed to present sufficient evidence to meet either element of its burden.

149.    Newton credibly testified as to his efforts to find employment since he was forced to retire in September 2020.

150.    Newton did what a reasonable person would do to find another comparable job in procurement and supply, including using online resources such as Indeed and ZipRecruiter and searching local newspapers.  Newton spends three to five hours a week conducting searches. He also created an account and submitted his resume to Westinghouse Industries, the largest public sector employer in the county where he resides.

151.    Newton rarely sees positions that match his experience and skill set.  He has applied for every position that may match, including comparable jobs as a buyer, senior buyer, procurement, or supply planner.

152.    Newton has not received any job offers.

153.    Newton's mitigation efforts allay any concerns that the front pay award is unjustified or speculative.

### 3. Lost pension benefits

154.    As the result of his forced retirement, Newton receives a monthly pension benefit of $5,516.13 or $66,193.56 per year.

155.    Newton testified that he planned to retire at age 60 from the PSP – the mandatory PSP retirement age.

156.    If Newton worked until age 60 and elected the same pension benefit, he would have received 62% of his salary of $135,288, in the amount of $83,878.56 per year.

157.    The difference between Newton's pension at forced retirement and if he had retired at age 60 is $17, 685 per year.

### 4. Front pay and lost pension benefit discount

158.    The final step in the front pay calculation is to reduce the award to present value. See, e.g., Thompson v. Cent. Sec. Agency, Inc., No. CIV. A. 98-2474, 1999 WL 126918, at *3 (E.D. Pa. Mar. 8, 1999) (discounting front pay award to present value); Barbour v. Merrill, 48 F.3d 1270, 1280 (D.C. Cir. 1995) ("All that remained was for [the court] to determine...the [front pay] award's present value, using an appropriate discount rate."). "Courts have taken a variety of approaches to the adjustment issue." See Baker v. John Morrell & Co., 263 F. Supp. 2d 1161, 1187 (N.D. Iowa 2003) (describing various approaches).

159.    The PSP argues that any award of front pay for future salary and pension benefits should be discounted to present value. PSP proposes a 5% discount rate. See ECF No. 168 at 12-13 (citing Donlin v. Phillips Elecs. N. Am. Corp., No. CIV.A. 3:05-CV-0585, 2007 WL 1238541, at *3 (M.D. Pa. Apr. 26, 2007), aff'd in part, remanded in part sub nom. Donlin, 581 F.3d 73;[14] Maxfield, 766 F.2d at 797 (3d Cir. 1985) (using 10% discount rate agreed to by plaintiff and "favorable to [defendant]")[15]; Barbour v. Medlantic Mgmt. Corp., 952 F. Supp. 857, 868 (D.D.C.), aff'd sub nom.,132 F.3d 1480 (D.C. Cir. 1997)).

---

[14] In Donlin, the district court noted some disagreement over the methodology used to calculate present value but accepted plaintiff's method noting "no alternate methodology was suggested." Donlin 2007 WL 1238541, at *3 (M.D. Pa. Apr. 26, 2007). On appeal, the Third Circuit found it was error to accept plaintiff's calculations based solely on her testimony, because "she had never performed a present-value discounting calculation prior to the day before trial," and thus present value was "not within [plaintiff's] personal knowledge." Donlin, 581 F.3d at 83.

[15] In Maxwell, the district court noted that plaintiff agreed to this amount "in lieu of presenting expert testimony as a basis for reduction" and despite the fact that the rate "is far more unfavorable" to plaintiff than the rate of between one and three percent suggested in Jones v. Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 549 (1981). Maxfield v. Sinclair Int'l, No. CIV.A.82-1911, 1984 WL 1794, at *4 (E.D. Pa. Aug. 8, 1984), aff'd, 766 F.2d 788 (3d Cir. 1985).

160.    Newton argues that the award of front pay should be reduced to present value using the formula: $PV = F/(1 + r\%)^t$, where PV is present value, F is future value, r% is a discount rate and "t" is the number of years.  ECF No. 172 at 4; <u>see also</u> <u>Fillman v. Valley Pain Specialists, P.C.</u>, No. 13-CV-01609, 2016 WL 192656, at *6 n.14 (E.D. Pa. Jan. 15, 2016).

161.    Newton requests that the court rely on the current U.S. Treasury bond rates, which assumes a risk free investment.  ECF No. 172 at 4-5; <u>and see</u>, <u>Fillman</u>, 2016 WL 192656, at *6 (using "average T-bill rate" for the full week prior to the week the order awarding front pay was entered).

162.    The U.S. Treasury bond rates for March 18, 2022, are:

    a.  5-year         2.14% yield

    b.  10-year        2.14% yield

    c.  20-year        2.53% yield

ECF No. 172-1.[16]

163.    Having reviewed approaches to reduce to present value, the Court finds that the use of the 2.14% discount rate as of March 18, 2022, based on the 10-year U.S. Treasury bond yield, is appropriate to reduce to present value the front pay award to Newton. The Court will employ a traditional computation for present value. Thus, reduction to present value will follow: $PV = F/(1 + r\%)^t$.

---

[16] Newton uses the "Daily Treasury Par Yield Curve Rate" in lieu of the "Daily Treasury Long-Term Rate." ECF No. 172-1. As explained by the United States Treasury Department, "The 'Daily Treasury Par Yield Curve Rates' are specific rates read from the daily Treasury par yield curve at the specific 'constant maturity' indicated. Thus, a yield curve rate is the single yield at a specific point on the yield curve.  For example, the 20-year daily yield curve rate (i.e., the 20-year CMT) represents the par yield for a new theoretical 20-year bond as of that date." https://home.treasury.gov/policy-issues/financing-the-government/interest-rate-statistics/interest-rates-frequently-asked-questions  The applicable rates may be found at: https://home.treasury.gov/resource-center/data-chart-center/interest-rates/TextView?type=daily_treasury_yield_curve&field_tdr_date_value=2022

**Front Pay Loss Reduced to Present Value**
**Using a Discount Rate of 2.14% Based on 10-Year U.S. Treasury Bond Yield**

| Date | Wage Loss | Present Value of Wage Loss |
|---|---|---|
| 11/13/2021 – 06/30/2022 | $71,320 | $69,826 |
| 07/01/2022 – 06/30/2023 | $115,060 | $112,649 |
| 07/01/2023 – 06/30/2024 | $116,745 | $111,904 |
| 07/01/2024 – 06/30/2025 | $118,778 | $111,468 |
| 07/01/2025 – 06/30/2026 | $120,857 | $111,042 |
| 07/01/2026 – 06/30/2027 | $122,972 | $110,618 |
| 07/01/2027 – 06/30/2028 | $125,124 | $110,196 |
| 07/01/2028 – 06/30/2029 | $127,313 | $109,775 |
| 07/01/2029 – 06/30/2030 | $129,541 | $109,355 |
| 07/01/2030 – 06/30/2031 | $131,808 | $108,938 |
| 07/01/2031 – 06/30/2032 | $134,115 | $108,522 |
| 07/01/2032 – 06/30/2033 | $136,462 | $108,108 |
| 07/01/2033 – 09/01/2033 | $22,744 | $17,641 |
| **TOTAL:** | **$1,472,839** | **$1,300,042** |

164.    Based on this calculation, the Court awards $1,300,042 in back pay after reduction to present value.

165.    The Court finds that the use of the 2.53% discount rate based on the 20-year U.S. Treasury bond yield is appropriate to reduce to present value Newton's lost pension benefits.

**SERS Loss Reduced to Present Value**
**Using a Discount Rate of 2.53% Based on 20-Year U.S. Treasury Bond Yield**

| Date | SERS Loss | Present Value of SERS Loss |
|---|---|---|
| 09/01/2033 – 12/31/2033 | $5,895 | $4,368 |
| 01/01/2034 – 12/31/2034 | $17,685 | $12,780 |
| 01/01/2035 – 12/31/2035 | $17,685 | $12,465 |
| 01/01/2036 – 12/31/2036 | $17,685 | $12,157 |
| 01/01/2037 – 12/31/2037 | $17,685 | $11,857 |
| 01/01/2038 – 12/31/2038 | $17,685 | $11,565 |
| 01/01/2039 – 12/31/2039 | $17,685 | $11,279 |
| 01/01/2040 – 12/31/2040 | $17,685 | $11,001 |
| 01/01/2041 – 12/31/2041 | $17,685 | $10,730 |
| 01/01/2042 – 12/31/2042 | $17,685 | $10,465 |
| 01/01/2043 – 12/31/2043 | $17,685 | $10,207 |
| 01/01/2044 – 12/31/2044 | $17,685 | $9,955 |
| 01/01/2045 – 12/31/2045 | $17,685 | $9,709 |
| 01/01/2046 – 12/31/2046 | $17,685 | $9,470 |
| 01/01/2047 – 12/31/2047 | $17,685 | $9,236 |
| 01/01/2048 – 12/31/2048 | $17,685 | $9,008 |
| 01/01/2049 – 12/31/2049 | $17,685 | $8,786 |
| 01/01/2050 – 12/31/2050 | $17,685 | $8,569 |
| 01/01/2051 – 12/31/2051 | $17,685 | $8,358 |
| 01/01/2052 – 12/31/2052 | $17,685 | $8,151 |
| 01/01/2053 – 12/31/2053 | $17,685 | $7,950 |
| 01/01/2054 – 12/31/2054 | $17,685 | $7,754 |
| **TOTAL:** | **$377,280** | **$215,820** |

166.    Based on this calculation, the Court awards $215,820 in lost pension benefits after reduction to present value.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Back Pay, Front Pay and Prejudgment Interest is granted.  Newton is awarded:

> Back pay in the amount of  $132,276.00;
>
> Prejudgment interest in the amount of $5,136.18;
>
> Front pay in the amount of $1,300,042.00; and
>
> Lost pension benefits in the amount of $215,820.00.

This award totals $1,653,274.18, in addition to the compensatory damages awarded by the jury.

An appropriate Order follows.

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

Dated: March 24, 2022

cc:    All counsel of record by Notice of Electronic Filing