**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT M. NEWTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 18-1639 |
| | ) | Magistrate Judge Maureen P. Kelly |
| v. | ) | |
| | ) | Re: ECF No. 180 |
| PENNSYLVANIA STATE POLICE, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

**KELLY, Magistrate Judge**

Plaintiff Robert M. Newton ("Newton") commenced this action against the Pennsylvania State Police ("PSP") to recover damages stemming from employment discrimination. The jury trial portion of this case was conducted on November 8 through 10, 2021, and resulted in a verdict for Newton. The jury found that the PSP terminated Newton's employment in violation of the Rehabilitation Act of 1973 and awarded Newton compensatory damages of $100,000. ECF No. 155. On November 12, 2021, the Court conducted the non-jury portion of the trial as to back pay, front pay, reinstatement, and prejudgment interest. ECF No. 156. On March 24, 2022, the Court held that Newton was entitled to back pay, front pay, and prejudgment interest of $1,653,274.18. ECF Nos. 176 and 177.

Presently before the Court is PSP's Motion for Reconsideration, ECF No. 180, requesting entry of judgment in its favor as a matter of law pursuant to Federal Rule of Civil Procedure 50, a

new trial, or an order amending the judgment pursuant to Federal Rule of Civil Procedure 59(e). For the reasons that follow, the Motion for Reconsideration will be denied.[1]

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Newton successfully completed PSP academy training and was promoted to the rank of Trooper in March 1996. ECF No. 159 at 121-22. As a Trooper, he was one of 4,700 PSP members assigned to 16 troops across the Commonwealth. The total force is capped by statute at 4,310; however, Pennsylvania provides additional funding for many ancillary roles bringing the total force to 4,700. There is no evidence that the statutory limit was a factor in Newton's termination or considered by PSP at any time relevant to this litigation. Id. at 160-61. Of the 4,700 members of the PSP, approximately 3,000 troopers serve in a patrol function. Id. at 157, 160. The remainder serve in various assignments including anti-crime, administrative roles, gaming enforcement, and liquor enforcement. Id. at 157, 160, 191.

At times relevant to this litigation, each of the 16 PSP Troops throughout the Commonwealth was assigned a "specialized" position of Procurement and Supply Officer. Id. at 82. PSP's specialized roles include job categories that are not patrol positions. Id. at 55, 84. The Procurement and Supply Officer is not reserved for Troopers on limited duty due to injury or illness, and all Troopers, whether full-duty or not, can apply for an opening in this specialized position.

In April  2001, Newton transferred to the Troop D Patrol Unit in Butler, Pennsylvania to be closer to his family. Id. at 50-51. In August 2001, Newton was diagnosed with osteosarcoma to his left shoulder. In February 2002, he underwent surgical removal of the affected bone and muscle. The procedure limited the use of his left arm. Id. at 52-53. He continued to work in a

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case. ECF Nos. 6 and 8.

limited-duty capacity during much of his cancer treatment. Id. 54-55.  In April 2003, Newton applied for and was selected for an open position as Alternate Troop Procurement and Supply Officer. This administrative position was open to all Troopers, existed before Newton's limited duty status, and was not created to accommodate his illness or disability. The next month, PSP placed Newton on "permanent limited-duty status." Id. In August 2003, the full-time Procurement and Supply Officer retired and, as the alternate, Newton successfully applied for the position. Id. at 56.

The evidence at trial included the job description for the Procurement and Supply Officer position. The jury learned that the job did not require Newton (or any other Trooper holding the position) to carry or use a firearm to fulfill his responsibilities. Instead, he was required to ensure that each of the five stations within Troop D had all the supplies, uniforms, fuel, and equipment necessary to carry out assigned operations, and to function as the field purchasing officer. Newton was responsible to monitor expenditures, ensure cost containment and vendor compliance with contractual obligations, assist in preparation of the annual troop budget, and track equipment and inventory. Id. at 57 – 64. If an incident occurred that required a large-scale response, whether day or night, or on a day off, Newton was responsible to provide necessary special equipment, food, hygiene, lighting, and communications gear. Id. at 64-65. Newton also served as the CPR/First Aid/AED instructor for Troop D, and as the designated Members' Assistance Program peer contact. Id. at 65-67. Newton's written job description also provided that he would perform other assigned duties "as required inasmuch as they do not conflict with the limitations set forth by the state police medical officer." Id. at 68. These limitations related to exposure to physical confrontation, none of which fell within any Procurement and Supply Officer responsibilities. There is no dispute that Newton satisfactorily performed all essential duties of his job for 17 years.

Despite the longevity of other Troopers in the same specialized position, Newton was forced to retire upon reaching 25 years of service. PSP contends that its interpretation of the union contract between PSP and The Pennsylvania State Troopers Association requires any Trooper on permanent limited-duty status to retire on the day he or she reaches 25 years of creditable service. ECF No. 159 at 112. The jury learned, however, that the language of the contract is not mandatory. Rather, under the contract, "[m]embers placed into a permanent limited-duty status *shall not be guaranteed* entitlement of continuing limited duty beyond the date they reach 25 years of creditable service." Id. at 111 (emphasis added). The PSP Chief of Labor Relations agreed that this language gives the PSP discretion to retain permanent limited duty Troopers. Yet, PSP interprets this provision to require the retirement of any union member on permanent limited duty status because of disability, regardless of job title or the essential functions of any specialized position. Id. at 112-13. Thus, while Troop E employed a full duty trooper who held the Procurement and Supply position for over 30 years, PSP required Newton to retire at 25 years of service only because of his disability. Id. at 82-83,113-115.

Newton received notification that he would be forced to retire on September 5, 2020. He requested that PSP elect to withdraw his "forced retirement" and permit him to continue in his job as a Procurement and Supply Officer. His request was denied. Id. at 115-17.

Newton commenced this action against the PSP on December 7, 2018, with the filing of the initial Complaint. When his complaint was filed, Newton was still employed and challenged only PSP's refusal to promote him to the rank of Corporal due to his limited duty status. ECF No. 1. He sought damages in the form of back pay, front pay, and compensation for emotional distress, as available under the Rehabilitation Act of 1973, 29 U.S.C. § 794a(a)(2) and 28 U.S.C §§ 1343(a)(3) and (a)(4) and 1331, and the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§§ 12101, *et seq*. In Count I of the initial Complaint, Newton alleged violations of the Rehabilitation Act based on the PSP's refusal to promote him to the position of Corporal because of his disability, record of disability, or perceived disability. ECF No. 1 ¶¶ 28-34. In Count II, Newton alleged that he faced harassment, discrimination, and retaliation by the PSP based on his disability in violation of the PHRA.  Id. ¶¶ 35-37.

At the close of discovery, Newton filed a Motion for Partial Summary Judgment seeking judgment as a matter of law on Count I, discrimination in violation of the Rehabilitation Act and, as to part of Count II, discrimination in violation of the PHRA. ECF No. 39 ¶ 5. This Court denied the motion *sua sponte* and dismissed Plaintiff's PHRA claims in federal court based on Eleventh Amendment immunity. ECF No. 53.

PSP forced Newton to retire on September 5, 2020. Newton filed an Amended Complaint to assert additional claims for the violation of the Rehabilitation Act including Termination (Count II) and Retaliation (Count III). ECF No. 68. Following the issuance of a right to sue notice by the Equal Employment Opportunity Commission ("EEOC") for his wrongful termination claim, Newton filed the operative Second Amended Complaint. ECF No. 81. The Second Amended Complaint added claims under the ADA for Discrimination (Count IV) and Retaliation (Count V). Id.

On April 8, 2021, the parties stipulated to the dismissal of the ADA and Rehabilitation Act retaliation claims (Counts III and V). ECF No. 93. Before trial, the parties stipulated to the dismissal of the ADA discrimination claim (Count IV). ECF No. 142. As a result, the case proceeded to trial on Newton's failure to promote and termination claims, alleging violations of the Rehabilitation Act.

The jury trial portion of this case was conducted on November 8 through 10, 2021. At the close of Newton's case, PSP moved for entry of judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) and contended: (1) Newton is not a qualified individual for his position as a Procurement and Supply Officer; (2) PSP has no obligation to continue his employment as an accommodation; (3) Newton's disability was not the sole reason for his retirement; rather, the union contract requires termination of limited duty troopers who reach 25 years of service; (4) PSP did not discriminate and displayed no animus against Newton based on his disability as evidenced by a going away lunch (complete with cake); and, (5) Newton was not eligible for promotion because he was on limited duty and PSP's policy against promoting any trooper on limited duty has been applied uniformly. ECF No. 159 at 139-140. The Court held that the evidence presented in Newton's case-in-chief was sufficient to make out a prima facie claim of disability discrimination under the Rehabilitation Act and denied the motion. Id. at 142-47. Newton's claims proceeded to the jury for consideration.

On November 10, the jury returned a verdict for Newton. The jury determined that the PSP terminated Newton's employment in violation of the Rehabilitation Act and awarded him compensatory damages of $100,000.[2]   ECF No. 155.

On November 12, 2021, the Court conducted the non-jury portion of the trial as to back pay, front pay, reinstatement, and prejudgment interest relative to the termination claim. ECF No. 156. Upon consideration of Newton's Motion for Back Pay, Front Pay and Prejudgment Interest, and the briefs and exhibits filed in support and in opposition, ECF Nos. 164, 165, 168, 172, the parties' Proposed Findings of Fact and Conclusions of Law, ECF Nos. 163, 169, and the testimony presented, the Court granted Newton's Motion and awarded $1,653,274.18. ECF Nos. 176 and

---

[2] The jury found for PSP on the failure to promote claim. ECF No. 155.

177. The Court determined, based on the testimony evidence presented, that reinstatement was not feasible based on disharmony between the parties. Thus, Newton was entitled to front pay. The Court further held that the award of front pay damages was not subject to an offset by any future pension benefit payments that were previously earned as deferred compensation.

Upon the entry of an award for attorneys' fees and judgment, PSP filed the pending Motion for Reconsideration seeking judgment notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 50(b), or, in the alternative, a new trial. ECF No. 180. PSP also asks the Court to alter the judgment under Rule 59(e) to order Newton's reinstatement or offset Newton's front pay damages by the amount of pension benefits he will receive. Id. The parties have filed briefs in support and in opposition to the Motion for Reconsideration. ECF Nos. 181 and 188. The motion is ripe for consideration.

## II.  STANDARD OF REVIEW

### A.  Motion for Reconsideration

"To succeed on a motion for reconsideration, the party seeking to have a judgment altered or amended must demonstrate either: (1) a change in controlling law; (2) the availability of new evidence not previously before the court; or (3) 'the need to correct a clear error of law or fact or to prevent manifest injustice.'" Lezark v. I.C. System, Inc., No. 20-cv-0403, 2022 WL 1997273, at *2 (W.D. Pa. June 6, 2022) (quoting Allaham v. Naddaf, 635 F. App'x 32, 35-36 (3d Cir. 2015) and U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P., 769 F.3d 837, 848-49 (3d Cir. 2014)). "Motions for reconsideration are appropriate to rectify plain errors of law or to offer newly discovered evidence, and they may not be used to relitigate old matters or to present evidence that could have been offered earlier." Id. (quoting Scheller v. Phila. Newspapers, Inc., 636 F. App'x 865, 868 (3d Cir. 2016)).

**B.  Motion for Judgment as a Matter of Law**

Under Federal Rule of Civil Procedure 50(a),

> [i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> > (A)  resolve the issue against the party; and
> >
> > (B)  grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)). Under Rule 50(b),

> [i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

Fed. R. Civ. P. 50(b).

Thus, when the issues raised in a Rule 50(b) motion have been raised in a timely Rule 50(a) motion, the Court may grant a motion for judgment as a matter of law only if, "the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.'" In re Lemington Home for the Aged, 777 F.3d 620, 626 (3d Cir. 2015) (quoting Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d 243, 249 (3d Cir. 2001)) (quotation marks and citations omitted). "Because the jury returned a verdict in favor of the plaintiff, [the Court] must examine the record in a light most favorable to the plaintiff, giving [him] the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn." Dudley v. S. Jersey Metal, Inc., 555 F.2d 96, 101 (3d Cir. 1977).

8

### C.  Motion for New Trial and Amendment of Judgment

Along with a motion for judgment as a matter of law, a losing party may also move for a new trial or to alter or amend a judgment pursuant to Federal Rule of Civil Procedure 59. See Fed. R. Civ. P. 50(b) (allowing Rule 50(b) movant to "include an alternative or joint request for a new trial under Rule 59").

"The court may, on motion, grant a new trial on all or some of the issues – and to any party ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court ...." Fed. R. Civ. P. 59(a)(1)(A). The Court may grant a new trial "purely on a question of law"; or to correct a previous ruling "on a matter that initially rested within the discretion of the court, e.g., evidentiary rulings or prejudicial statements made by counsel"; or "because [the Court] believes the jury's decision is against the weight of the evidence"; among other grounds. Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993) (internal citations omitted).

Federal Rule of Civil Procedure 59(e) allows for "[a] motion to alter or amend the judgment." "[A] proper Rule 59(e) motion ... must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." In re Processed Egg Prod. Antitrust Litig., 962 F.3d 719, 729 (3d Cir. 2020) (quoting Wiest v. Lynch, 710 F.3d 121, 128 (3d Cir. 2013) (quotation marks omitted)). The PSP argues that the instant motion is warranted to correct an error of law and an injustice.

III.    **DISCUSSION**

A.  **"Otherwise Qualified" to Perform the Essential Functions of the Job**

PSP contends that it is entitled to judgment as a matter of law because Newton failed to prove a violation of his rights under the Rehabilitation Act. ECF No. 181 at 2-7. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 29 U.S.C. § 794(a). To prove discrimination under the Act, a plaintiff must show "(1) that he or she has a disability[;] (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996). If a plaintiff succeeds in making that showing, then the burden shifts to the defendant to prove, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable or would pose an undue hardship on the employer. Id.

Here, the first and third elements of the Rehabilitation Act claim – whether Newton had a disability and was forced to retire –  are undisputed. As to the second element, PSP asserts that Newton is not qualified for the position of PSP Trooper because he cannot perform the essential functions of the job. Thus, PSP contends it is entitled to judgment in its favor as a matter law. ECF No. 181 at 2-5.

In his Brief in Opposition, Newton argues that the jury properly determined that he was a qualified individual able to perform the essential functions of a Trooper assigned to the position of Procurement and Supply Officer.  ECF No. 188 at 1-3.  Newton points out that the PSP ignored the Court's final jury instructions.  Id. at 1-2.  He further asserts that the PSP's focus on the

10

essential functions of a "full duty Trooper" is misplaced because Newton held the specialized position of Procurement and Supply Officer. Id. at 2.

"[T]he burden is on the employee to prove that he is an otherwise qualified individual." Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998) (internal quotation marks and citation omitted). "A 'qualified individual' is defined as one 'who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" Turner v. Hershey Chocolate U.S., 440 F.3d 604, 611 (3d Cir. 2006) (quoting 42 U.S.C. § 12111(8) and citing Buskirk v. Apollo Metals, 307 F.3d 160, 168 (3d Cir. 2002)). "The EEOC regulations divide this inquiry into two parts: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position." Id. (citing 29 C.F.R. § 1630.2(n); Buskirk, 307 F.3d at 168). The determination of whether an individual with a disability is qualified is made at the time of the employment decision, and not at the time of the lawsuit. Gaul,134 F.3d at 580.

In Turner, the United States Court of Appeals for the Third Circuit reversed the entry of summary judgment for the defendant employer because the district court improperly resolved a factual question on whether the plaintiff was otherwise qualified based on defendant's assertion that an essential function of the plaintiff's job included rotating between production locations. The Third Circuit observed that what constitutes an "essential function" is a factual determination properly left to the jury, to be determined by consideration of several factors.

> Whether a job duty is an "essential function" turns on whether it is "fundamental" to the employment position. 29 C.F.R. § 1630.2(n)(1). The term "essential function" does not include the "marginal" functions of the position. Id. A job function may be considered essential for any of several reasons, including, but not limited to, the following:

> (i)     The function may be essential because the reason the
>         position exists is to perform that function;
> (ii)    The function may be essential because of the limited number
>         of employees available among whom the performance of
>         that job function can be distributed; and/or
> (iii)   The function may be highly specialized so that the
>         incumbent in the position is hired for his or her expertise or
>         ability to perform the particular function.

Id. at § 1630.2(n)(2). We have difficulty when we attempt to reconcile these concepts with the District Court's determination that Hershey's rotation scheme was an "essential function." Specifically, we note that (i) the shaker table inspector position does not exist in order that inspectors may rotate; that (ii) implementing or not implementing the rotation scheme would appear to have no effect on the number of employees required to operate the shaker tables; and (iii) rotating is not a highly specialized function and Turner was not hired for her rotating ability.

Evidence of whether a particular function is essential might include, but is not limited to:

> (i)     The employer's judgment as to which functions are essential;
> (ii)    Written job descriptions prepared before advertising or interviewing
>         applicants for the job;
> (iii)   The amount of time spent on the job performing the function;
> (iv)    The consequences of not requiring the incumbent to perform the
>         function;
> (v)     The terms of a collective bargaining agreement;
> (vi)    The work experience of past incumbents in the job; and/or
> (vii)   The current work experience of incumbents in similar jobs.

Id. at (n)(3).

Turner, 440 F.3d at 612.

In the instant case, it was undisputed at trial that the position of Procurement and Supply Officer was a "specialized" position in every Troop and that the position was open to both full-duty and limited duty Troopers. After successfully applying for the position, Newton satisfactorily performed his job for 17 years. Thus, by any measure, the jury could conclude that at the time of employment and for years after, Newton was qualified for the position. Despite this evidence, PSP argues that the job of a "full-duty" patrol Trooper is the benchmark Newton must satisfy. ECF No.

181 at 2. To that end, PSP cites the testimony of the PSP Chief of Labor Relations[3] that the essential functions of a "full-duty trooper" include the ability to make arrests, communicate effectively, and to:

> utilize handcuffs, other techniques to maybe take someone into custody who may be resisting arrest. They have to be able to utilize a firearm and qualify with a firearm. They are called out- they need to be available to report to all types of incidents, critical incidents, natural disaster incidents, pretty much any of the  -- be able to respond to any and all incidents.

Id. at 3 (quoting ECF No. 159 at 159).

The evidence presented at trial relative to Newton's Procurement and Supply Officer position told a different story. The jury heard that Newton's written job description does not include making arrests or taking individuals into custody who may be resisting arrest. There was no evidence presented by PSP (1) that Newton's job description differed in any material way from the job description of any other full duty Trooper assigned to the Procurement and Supply Officer position; (2) that full duty Procurement and Supply Officers performed forcible arrests; or (3) that, by not performing these functions, PSP or any Troop suffered harm. PSP also failed to present evidence that the relevant collective bargaining agreement required Troopers in specialized administrative roles to perform arrests, use handcuffs, or take anyone resisting arrest into custody. Thus, except for the first factor – the employer's judgment –  as testified to by PSP's sole witness, the evidence supported the jury's conclusion that Newton was "otherwise qualified" within the meaning of the Rehabilitation Act.

The evidence presented by Newton and PSP contrasts with the evidence presented in Champ v. Baltimore Cnty., 884 F. Supp. 991 (D. Md. 1995), which PSP relies on for its argument that it is entitled to judgment as a matter of law. In Champ, the district court determined that the

---

[3] PSP called one witness at trial - Brooke Meade, PSP's Chief of Labor Relations. ECF No. 159 at 152. She never had any communication with Newton.

plaintiff police officer was not "otherwise qualified" within the meaning of the ADA because he could not perform the essential functions of a full duty police officer. However, the evidence established that for 16 years, the officer remained in a "light duty" position designed to accommodate the temporary assignment of disabled officers. Non-disabled light duty officers were required to perform the essential duties of all patrol and non-patrol officers because they could be reassigned at any time and pulled from their light duties to assist in emergencies. In addition, the employer's evidence included existing severe budgetary constraints that mandated the removal of officers who could not perform the full duties of a police officer. Id. at 994, 997-99.

Here, it was not disputed that the Procurement and Supply Officer position was available to all full-duty officers, and thus was not a reserved temporary "light duty" position. The essential functions of this administrative job, as shown by the job description, did not include participation in forcible arrests or the use of a weapon. And, to that end, PSP did not present evidence that a full-duty Procurement and Supply Officer has been pulled or subject to discretionary reassignment to perform the duties of a patrol Trooper, to make forcible arrests or to use a weapon. Nor was there evidence of adverse consequences suffered by PSP or any Troop because Procurement and Supply Officers do not perform these patrol related functions. Under these circumstances, the evidence viewed in the light most favorable to Newton as the verdict winner establishes that Newton was "otherwise qualified" for his position because he could perform his job with or without reasonable accommodation.

### B.  Reasonable Accommodation

PSP contends that if Newton is "otherwise qualified," the requested accommodation of continued employment beyond 25 years violates the Collective Bargaining Agreement ("CBA") and, thus, is unreasonable. ECF No. 181 at 5-7. Newton responds that the CBA does not require

termination, but provides PSP discretion to continue employment. As such, PSP's automatic separation of members on permanent limited duty status without regard to an analysis of the essential functions of the job is itself evidence of discrimination in violation of the Rehabilitation Act. ECF No. 188 at 3.

Under the ADA, and as applicable to claims arising under the Rehabilitation Act, 29 U.S.C. § 794(d), "an employer discriminates against a qualified individual with a disability when the employer does not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing 42 U.S.C. § 12112(b)(5)(A)). Reasonable accommodations include "measures such as 'job restructuring, part-time or modified work schedules ... acquisition or modification of equipment or devices ... and other similar accommodations for individuals with disabilities.'" Freeman v. Chertoff, 604 F. Supp. 2d 726, 734 (D.N.J. 2009) (citing 42 U.S.C. § 12111(9)(B)).

An employer is not required to create a new position to accommodate an employee with a disability, or to transform a temporary light duty position into a permanent position. Turner, 440 F.3d at 614 (citing Buskirk, 307 F.3d at 169). Nor is an employer required to violate a union contract to the detriment of the rights of other employees to accommodate a disabled employee. Jones v. Service Electric Cable TV, Inc., 809 F. App'x 105, 109 (3d Cir. 2020) (citing Kralik v. Durbin, 130 F.3d 76, 83 (3d Cir. 1997) (requested accommodation is unreasonable because it would require the employer to infringe on the seniority rights of other employees under collective bargaining agreement)).

In this case, the evidence at trial permitted the jury to determine that continuing as a Procurement and Supply Officer did not require transforming a light duty job to a permanent position. The Procurement and Supply Officer position was available to all Troopers, whether full duty or light duty, and was open when Newton successfully applied for the position. And as evidenced by the 30-year incumbent in Troop E, employment as a Procurement and Supply Officer was not fixed to a term. Moreover, during his 17 years in the position of Procurement and Supply Officer, Newton was able to perform the essential functions of the position without any accommodation. Thus, Newton's continued employment beyond 25 years also did not require accommodation.

PSP's reliance on the CBA to establish that retention is unreasonable as matter of law also fails. First, PSP's Chief of Labor Relations conceded that the contract language relied on to force Newton to retire does not mandate termination. PSP has interpreted the language to require retirement, but the contract submitted for jury consideration provides for discretion, and distinguishes between members on work-related limited duty and those who suffer non-work-related disabilities. ECF No. 152, Exhibit 6; ECF No. 159 at 111-12, 114. The CBA provides that those PSP members on work-related limited duty who reach 25 years of service while on limited duty, "shall be separated from employment." ECF No. 152, Exhibit 6. At the same time, PSP members with non-work-related disabilities who are "placed into a permanent limited duty status *shall not be guaranteed* entitlement of continuing limited duty" beyond the date they reach 25 years of service. ECF No. 159 at 111 (emphasis added). Thus, the jury could weigh the credibility of PSP's witness testimony that the CBA mandated separation on the day Newton reached the twenty-fifth year of service against the actual language of the contract, and conclude that it did not.

Second, PSP relies on <u>Kralik</u> for the proposition that an accommodation is unreasonable when it "requires an employer to violate or run afoul of a CBA." ECF No. 181 at 6. As explained in <u>Jones</u>, this interpretation is far too broad. In <u>Kralik</u>, the Third Circuit concluded that an accommodation is unreasonable if providing that accommodation "violates the seniority rights of other employees" or was made "at the expense of other employees." <u>Jones</u>, 809 F. App'x at 109 (quoting <u>Kralik</u>, 130 F.3d at 83; and quoting <u>Shaner v. Synthes (USA)</u>, 204 F.3d 494, 506 n.14 (3d Cir. 2000)). In this case, PSP presented no evidence that exercising discretion to continue Newton's employment would violate the CBA or the established rights of any other employee under the terms of the CBA. Thus, whether an issue of law for the Court or an issue of fact for the jury, the evidence presented by the PSP failed to establish that the terms of the CBA render Newton's continued employment beyond 25 years an unreasonable accommodation.

### C.  Jury Instruction

PSP contends that it is entitled to a new trial because "the Court did not allow the question whether Newton was otherwise qualified to be a Trooper under Count II in front of the jury." ECF No. 181 at 4, 7. Upon review, the charge apprised the jury of the issues and the applicable law under the facts and evidence presented and thus a new trial is not warranted on this basis. See <u>Risk v. Burgettstown Borough, Pa.</u>, No. CIV.A. 05-1068, 2008 WL 4925641, at *13 (W.D. Pa. Nov. 14, 2008), *aff'd sub nom.*, 364 F. App'x 725 (3d Cir. 2010) ("In evaluating contentions of error with regard to jury instructions, the relevant inquiry is 'whether the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury.' <u>United States v. Tiller</u>, 302 F.3d 98, 104 (3d Cir. 2002) (citing <u>Ayoub v. Spencer</u>, 550 F.2d 164, 167 (3d Cir. 1977)))."

During the charge conference, Newton's counsel requested that the jury be instructed that to prevail, Mr. Newton must prove by a preponderance of the evidence … [that] "with regard to his forced retirement claim, that Mr. Newton is a qualified individual able to perform the essential functions of a Trooper assigned to the position of Procurement and Supply Officer, with or without reasonable accommodation by his employer." ECF No. 159 at 214-15. PSP's counsel stated that he did not object to this proposed instruction, and the Court agreed to the change. Id. The Court included this language in its charge. ECF No. 160 at 19-21.

PSP then pivoted to request that the jury also be charged that it must find Newton capable of performing the essential functions of the job of Corporal (for purposes of his failure to promote claim) and the job of Trooper (for purposes of his termination claim), without reference to his position as a Procurement and Supply Officer. ECF No. 159 at 216. Until this point – for purposes of jury instruction – PSP contested only whether Newton was "otherwise qualified" to perform the essential functions of a Corporal. See Proposed Jury Instructions, ECF No. 109 at 5-6; Proposed Verdict Slip, ECF No. 108. As to Newton's forced retirement, PSP asserted only that "the reason Plaintiff retired was because the Collective Bargaining Agreement – which was negotiated between PSP and Mr. Newton's union – directed that members in Plaintiff's circumstance must retire after 25 years of service." ECF No. 109 at 6-7; see also PSP's Pretrial Statement, ECF No. 101 at 4; Proposed Verdict Slip, ECF No. 108 at 3; Joint Stipulations, ECF No. 126 at 5.[4]  That

---

[4] PSP appears to argue that the Court's error in denying its proposed jury instruction is compounded by the exclusion of evidence that Newton's position was civilianized after his termination. ECF No. 181 at 4, 9. PSP contends that because status as a Trooper is no longer required for the Procurement and Supply Officer position, Newton is not "otherwise qualified" for employment. Id.

Before trial, this Court held that evidence of civilianization of the position was irrelevant because "the determination of whether a person was a qualified individual … is not made from the time the lawsuit was filed or any other later time period, but from the point at which the allegedly discriminatory decision was made." ECF No. 149 at 3-4 (quoting Bowers v. National Collegiate Athletic Ass'n, 475 F.3d 524, 535-36 (3d Cir. 2007)) (internal quotation marks omitted). As relevant here, Newton was considered qualified for the position of Troop Procurement and Supply Officer at the Butler headquarters effective April 3, 2003. Nine years later, the CBA was amended to provide that the position

said, the transcript of closing arguments establishes that the denial of PSP's belated request did not foreclose PSP's argument that to be "otherwise qualified" as a "Trooper assigned to the position of Procurement and Supply Officer," Newton must also establish that he was "otherwise qualified" as a Trooper. ECF No. 160 at 45-51. Thus, whether Newton was "otherwise qualified" presented a factual dispute for the jury to resolve based on evidence that Newton's job as a specialized Trooper was open to both full duty and limited duty officers, and that Newton performed all essential duties of his job without accommodation. PSP's request to instruct the jury to expand Newton's burden of proof to include the role of full-duty Trooper was properly denied.

### D.  Reinstatement

PSP also requests that the Court reconsider its conclusion that reinstating Newton to his former position is not feasible or available. ECF No. 181 at 7-11. PSP states that despite its long-held position throughout this litigation that Newton's job was no longer available because it had been "civilianized" after his termination, reinstatement is "unequivocally" offered now. Id. at 9. PSP also challenges the Court's conclusion that the parties do not face "the type of hostility that make reinstatement impractical." PSP points to the fact that Newton assisted former co-workers who called with follow-up questions, and that PSP is willing to return him to the same barracks in the same role.

Newton correctly notes that PSP failed to object to evidence of front pay at the non-jury portion of the trial and therefore waived the opportunity to object to an award of front pay in lieu

---

of Procurement and Supply Officer and six other PSP positions could be civilianized. However, civilianization could occur only by attrition "such that current enlisted members holding these positions shall be replaced by civilians only when the enlisted member leaves the position voluntarily or involuntarily." ECF No. 149 at 3-4. Thus, the Court determined that evidence of the later reclassification of Newton's job was not relevant to whether Newton was qualified when he was hired for the role or when he was terminated because, at both times, civilianization was not at issue. Instead, the only factor presented by PSP for termination was its interpretation of the CBA requiring separation after 25 years of service. Evidence that the assigned Procurement and Supply Officer at Troop E continued in his role for years after the CBA amendment buttresses the Court's conclusion that evidence of civilianization is irrelevant, and it would mislead or confuse the jury.

of reinstatement. ECF No. 188 at 4. Even if not waived, Newton contends that reinstatement is not feasible because even if the position is now open (and there is no evidence that position is not currently filled), PSP has not changed its policies related to accommodation of disabilities, and thus Newton will remain vulnerable to termination because of his permanent limited duty status. Id. at 5. Finally, in this case, reinstatement is not practical because of animosity between the parties. Newton faced a hostile work environment and is now pursuing a claim in state court related to harassment he suffered because of his disability. Id.

PSP is correct that the equitable remedy of reinstatement is preferred to achieve the goals of deterring discrimination and making a plaintiff whole. Squires v. Bonser, 54 F.3d 168, 176 (3d Cir. 1995). However, reinstatement is not always feasible and may be inappropriate where there exists irreparable animosity between the parties or because no comparable position exists. See Blum v. Witco Chem. Corp., 829 F.2d 367, 374 (3d Cir. 1987); Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 86 (3d Cir. 2009). The law permits consideration of psychological harm resulting from discrimination as a basis for front pay in lieu of reinstatement. See Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 846 (2001) ("In cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by the plaintiff as a result of the discrimination, courts have ordered front pay as a substitute for reinstatement."). And, in some cases, it may be "unduly difficult for the Court to police an ongoing relationship between the parties." Kairys v. S. Pines Trucking, Inc., No. 19-1031, 2022 WL 969595, at *8-9 (W.D. Pa. Mar. 31, 2022) (citing Goss v. Exxon Off. Sys. Co., 747 F.2d 885, 890 (3d Cir. 1984) (animosity rendered reinstatement inappropriate in an ERISA retaliatory termination action)).  "In such circumstances, the remedial purpose of the statute would be thwarted and plaintiff would suffer irreparable harm if front pay

were not available as an alternate remedy to reinstatement. Since reinstatement is an equitable remedy, it is the district court that should decide whether reinstatement is feasible." <u>Maxfield v. Sinclair Int'l</u>, 766 F.2d 788, 796 (3d Cir. 1985) (internal citation omitted). The Court has broad discretion in determining whether reinstatement is appropriate. <u>Feldman v. Phila. Housing Auth.</u>, 43 F.3d 823, 831 (3d Cir. 1994).

In this case, the Court held that reinstatement was not appropriate because until consideration of damages after trial, PSP consistently took the position that Newton's job was no longer available and had been civilianized. ECF No. 176 at 18. Even if available, the Court determined that based on the evidence and Newton's testimony at trial, the relationship between PSP and Newton "is so damaged that reinstatement is impractical." <u>Id.</u> at 19. In reaching this conclusion, the Court cited PSP's decision to terminate Newton because of his disability, the sudden and absolute way PSP notified Newton of his termination, and the raw and genuine emotional damage that PSP's treatment of Newton inflicted on him, as observed at trial. <u>Id.</u> Newton testified to the psychological injury he sustained because of PSP's unlawful behavior he experienced, despite his years of striving to be a valuable employee. His damages included harm to his feelings of self-worth, a loss of self-esteem, depression, feelings of betrayal, humiliation, and embarrassment. ECF No. 159 at 84-86. Newton's wife testified to changes in his personality since his termination that make it difficult to socialize with anyone outside the home, and Newton's loss of confidence in his own parenting skills. <u>Id.</u> at 133-35.

The evidence of record demonstrates that the relationship between the parties was irreparably damaged as a result of the events leading up to Newton's termination, the termination itself, and the litigation. Therefore, the Court properly exercised discretion finding that reinstatement under the circumstances was not feasible and an award of front pay was appropriate.

### E.  PSP's Entitlement to an Offset for Pension Benefits to be Received

PSP's final claim for relief again asks the Court to reconsider and explain its conclusion that PSP is not entitled to offset an award of front pay by the amount of pension benefits Newton will receive. ECF No. 181 at 11.  PSP claims that recovery of pension benefits along with front pay results in an impermissible windfall for Newton and is contrary to public interest, given that the payor is a governmental unit. PSP acknowledges the lack of precedential authority in the Third Circuit on the effect of pension benefits on an award of front pay and the long-standing split among federal appellate courts on this issue, and it requests that the judgment be amended to provide an offset of pension benefits to be received by Newton.[5] Id. at 12-13.

In his Brief in Opposition, Newton argues that his front pay damages should not be offset by any future income from his pension. ECF No. 188 at 6-7. Relying on applicable case law, Newton asserts that pension benefits received from past employment have been "earned" and, as such, are a collateral benefit not deductible from his front pay loss. Id.

In considering PSP's argument for an offset, the Court is guided by the goals of the Rehabilitation Act and anti-discrimination laws generally, the equitable nature of damage awards in cases of employment discrimination, and the lack of a statutory exclusion for recovery. With these factors in mind, the Court finds that like an award of back pay, an award of front pay should

---

[5] See EEOC v. Consol Energy, Inc., 860 F.3d 131, 149-50 (4th Cir. 2017); Doyne v. Union Elec. Co., 953 F.2d 447, 451-52 (8th Cir. 1992); Salitros v. Chrysler Corp., 306 F.3d 562, 573-74 (8th Cir. 2002); Lussier v. Runyon, 50 F.3d 1103, 1107-08 (1st Cir. 1995); Giles v. Gen. Elec Co., 245 F.3d 474, 495 (5th Cir. 2001); Graefenhain v. Babst Brewing Co., 870 F.2d 1198, 1210 (7th Cir. 1989).

Lussier v. Runyon is cited by PSP for the proposition that a trial court may offset a disability retirement annuity from a front pay award. ECF No. 181 at 12. In Lussier, the First Circuit determined that such a decision is within the discretion of the trial court and that the goal of deterrence "is a function of degree" that is not statutorily required to "be maximized at all costs." Lussier, 50 F.3d at 1112. In this case, the exercise of discretion to award front pay not offset by deferred compensation may serve to deter PSP's blanket application of discretion in a discriminatory manner and is otherwise supported by the considerations weighed by the Third Circuit in declining to offset back pay awards by the amount of any pension benefits received.

22

not be offset by Newton's receipt of pension benefits from the Pennsylvania State Employees' Retirements System ("SERS").

As this Court previously explained, "Congress designed the remedial measures in [anti-discrimination laws] to serve as a 'spur or catalyst' to cause employers 'to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges' of discrimination. Deterrence is one object of these statutes. Compensation for injuries caused by the prohibited discrimination is another." Newton v. Pennsylvania State Police, No. 18-1639, 2021 WL 4596448, at *2 (W.D. Pa. Oct. 6, 2021) (quoting McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 358 (1995) (internal citations omitted); and citing, Eshelman v. Agere Sys., Inc., 554 F.3d 426, 440 (3d Cir. 2009) (Congressional intent of remedial measures to deter employers and compensate victims is the same under the ADA)). PSP's request for an offset for pension benefits could "effectively eliminate the benefit" and the intent of anti-discrimination laws based on the happenstance of an employee qualifying for a pension at termination. Maxfield, 766 F.2d at 794 ("no reason why the benefit [of collateral benefits] should be shifted to the defendant.")). In such instances, "[a]s between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer." Id. at 795.

Certainly, "pension benefits received from a subsequent employer are simply another form of earned income, which, of course, may be set off from a front pay award consistent with plaintiff's duty to mitigate damages." Blum, 829 F.2d at 375. That said, pension benefits received for past employment with the employer defendant "are an integral part of an employee's compensation package, and indeed are generally referred to as deferred compensation." Id. at 374. Based on this distinction, the Third Circuit has clearly held that for back pay awards, "pension plan benefits, like

unemployment compensation benefits, are collateral benefits. Both unemployment compensation benefits and pension plan benefits are designed to serve social policies independent of those served by back pay awards." McDowell v. Avtex Fibers, Inc., 740 F.2d 214, 217 (3d Cir. 1984), *cert. granted, judgment vacated on other grounds*, 469 U.S. 1202 (1985). Thus, as compensation for past employment, the continued receipt of pension benefits is not compensation for discrimination, and therefore does not amount to a double payment.

The United States Court of Appeals for the Fourth Circuit similarly concluded that an employer could not offset pension benefits against a damages award that included both front and back pay. EEOC v. Consol Energy, Inc., 860 F.3d at 150 (employer's share of commingled pension benefits paid under a CBA "were a standard term of [plaintiff's] employment, rather than compensation for or indemnification against a Title VII violation."). And, in Doyne, 953 F.2d at 452, the United States Court of Appeals for the Eighth Circuit reversed the district court's conclusion that receipt of pension benefits along with plaintiff's salary would constitute a windfall. There, the Eighth Circuit reviewed the purpose of pension benefits and determined that pension benefits were offered as partial compensation for employment, and thus were a collateral source that could not be deducted from an ADEA award of front and back pay. Id.

In this case, Newton's pension benefits are paid by SERS based on the length of service to the Commonwealth before termination and are paid from a pool funded in part by various government agencies and employees. The payments received thus represent deferred compensation earned before his termination. Thus, Newton's pension benefits are from a collateral source, and serve an interest separate from indemnification for employment discrimination. Under these circumstances, and following Blum, the Court finds that PSP is not entitled to an offset from an award of front or back pay.

IV.     **CONCLUSION**

For the foregoing reasons, Defendant PSP's Motion for Reconsideration seeking the entry of judgment as a matter or law or, in the alternative, a new trial, or an amended judgment is properly denied. An appropriate Order will follow.

                              MAUREEN P. KELLY
                              UNITED STATES MAGISTRATE JUDGE

Dated: August 8, 2022

cc:     All counsel of record by Notice of Electronic Filing